UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | MAGISTRATE CASE NO.: '08 MJ 0843 |
| Plaintiff, | COMPLAINT FOR VIOLATION OF: |
| | Title 18, U.S.C., Section 111(a)(1) - Assault on a Federal Officer |
| v. | Title 8, U.S.C., Section 1324(a)(2)(B)(iii) - Bringing in Illegal Aliens Without Presentation |
| Martin Ortiz-Castaneda, | |
| Defendant | |

The undersigned complainant, being duly sworn, states:

Count 1

On or about March 15, 2008, within the Southern District of California, defendant Martin Ortiz-Castaneda, did knowingly and intentionally, and forcibly assault, resist, oppose, impede and interfere with a person named in Title 18, United States Code, Section 1114, namely Department of Homeland Security, United States Border Patrol Agent John M. Griffin, in that the defendant, in an effort to resist arrest, attempted to violently kick and elbow Griffin, fled from Griffin, threw a rock at Griffin, picked up a larger, softball-sized rock and threatened to strike Griffin with it, and violently bit Griffin in the bicep while Agent Griffin was engaged in the performance of his official duties, in violation of Title 18, United States Code, Section 111(a)(1).

## Count 2

On or about March 15, 2008, within the Southern District of California, defendant Martin Ortiz-Castaneda, with the intent to violate the immigration laws of the United States, knowing and in reckless disregard of the fact that aliens, namely, Antonio Galvez-De Jesus, Adolfo Galvez-De Jesus, Albertano Pantaleon-Najera, Francisco Ramirez-Velasquez had not received prior official authorization to come to, enter and reside in the United States, did bring to the United States said aliens and upon arrival did not bring and present said aliens immediately to an appropriate immigration officer at a designated port of entry; in violation of Title 8, United States Code, Section 1324(a)(2)(B)(iii).

And the complainant states that this complaint is based on the attached Probable Cause Statement incorporated herein by reference.

VICTOR L. NGUYEN, Special Agent
Federal Bureau of Investigation

SWORN TO ME AND SUBSCRIBED IN MY PRESENCE THIS 17th DAY OF March 2008.

Honorable LEO S. PAPAS
United States Magistrate Judge

CONTINUATION OF COMPLAINT:
UNITED STATES v. MARTIN ORTIZ-CASTANEDA

PROBABLE CAUSE STATEMENT

I, Special Agent Victor L. Nguyen, declare under penalty of perjury, the following is true and correct:

These facts are based on my personal participation in this investigation, as well as written and oral statements received from other law enforcement officers. I submit the facts contained in this statement demonstrate probable cause exists to believe that the defendant named in the attached complaint committed the crimes charged in the complaint. I have not included each and every fact known to me about the defendant or this investigation. I have included only those facts which I believe are necessary to establish probable cause to believe that the defendant committed the crimes alleged in the complaint.

This affiant states that Antonio Galvez-De Jesus, Adolfo Galvez-De Jesus, Albertano Pantaleon-Najera, and Francisco Ramirez-Velasquez are citizens of a country other than the United States; that said aliens have admitted that they are deportable; that their testimony is material; that it is impracticable to secure their attendance at the trial by subpoena; and they are material witnesses in relation to this criminal charge and should be held or admitted to bail pursuant to Title 18, United States Code, Section 3144.

On March 15, 2008, at approximately 2:05 a.m., Border

4

1  Patrol Agent John M. Griffin was performing linewatch duties in
2  the Imperial Beach Station area of operations. Agent Griffin
3  was approximately one and a half miles west of the San Ysidro
4  Port of Entry when he responded to infra-red scope traffic from
5  Staff Sergeant Raymond Barr of the California National Guard.
6  Sergeant Barr reported via radio that a group of five suspected
7  illegal aliens were moving north from the primary border fence
8  that separates the United States and Mexico in an area known as
9  Stewart's Bridge.
10      This area is a frequent crossing point for illegal aliens
11 due to its close proximity to populated areas. Additionally,
12 there is dense brush in this area and its immediate
13 surroundings that provides cover for individuals illegally
14 entering the United States. There is a secondary fence
15 approximately forty yards north of the primary fence. Due to
16 the presence of these two fences and no access to the public,
17 there is no reason for anyone to be in this area unless they
18 are attempting to illegally enter the United States.
19      Sergeant Barr observed that the individuals approached a
20 grate to a concrete culvert that drains the area. This culvert
21 is approximately forty five feet wide and has five foot
22 concrete walls. At this point, he lost visual of the subjects
23 and coordinated three marked Border Patrol units to the area
24 where he had last seen the subjects. Border Patrol Agent
25 Ricardo Perez responded and parked to the north of the
26 location. Border Patrol Agent Neil Crawford and Agent Griffin
27 responded to the south. Agent Perez first saw the subjects and
28

1  verbally identified himself as a Border Patrol Agent and
2  commanded them to get on their knees with their hands on their
3  heads. All of the subjects complied, except one individual,
4  later identified as defendant Martin Ortiz-Castaneda, who ran
5  toward the primary fence in an attempt to flee. Upon seeing
6  Agent Griffin, the defendant ran toward the drainage culvert
7  and jumped into it.

8        The defendant then ran across the culvert and was
9  attempting to exit it when Agent Griffin caught up to him and
10 grabbed the defendant's leg. Agent Crawford was following and
11 had just entered the culvert when he witnessed the defendant
12 and Agent Griffin fall from the culvert wall. Agents Crawford
13 and Griffin began to struggle with the defendant. The
14 defendant attempted to violently kick and elbow both Agents as
15 they tried to place him under arrest. Due to the intensity of
16 the defendant's resistance, he managed to break free and
17 started running out of the culvert, fleeing eastbound from
18 Stewart's Bridge. The defendant ran approximately 100 yards
19 and then tried to scale the primary fence east of Stewart's
20 Bridge.

21       Agent Griffin reached the defendant after he made an
22 unsuccessful attempt to scale the primary fence and dropped
23 back down to the ground. Agent Griffin observed the defendant
24 to be holding a small rock while the defendant continued moving
25 eastbound. During the Agents' pursuit the defendant turned and
26 threw the small rock in the Agents' general direction, and then
27 picked up a large softball-sized rock. Agents verbally
28 commanded the defendant in Spanish to drop the rock. Due to

1   the inherent danger of being assaulted with rocks so close to
2   the fence, Agents drew their bureau firearms.
3        The defendant continued to ignore the Agents' commands
4   and began to move eastbound hugging the primary fence line with
5   the rock in his hand. During this time, the defendant made
6   several furtive throwing motions with the rock in his hand. As
7   the defendant approached the part of the fence known as the
8   "sludge gate," he attempted to climb the fence and return to
9   Mexico. It should be noted that the area of the fence known as
10  the "sludge gate" provides several hand and foot holds that
11  would facilitate an easier return to Mexico.
12       Both Agents holstered their bureau weapons and attempted
13  to arrest the defendant a second time. Each Agent deployed
14  their government issued oleoresin capsicum (OC) pepper spray
15  and utilized it on the defendant as he was attempting to scale
16  the fence again. The defendant did not seem to be affected by
17  this and he was wrestled off the fence and to the ground.
18  After landing on his head, the defendant continued to fight and
19  did not appear to be fazed by any of the Agents' palm strikes
20  or hand and knee blows.
21       At this point Agent Crawford attempted to handcuff the
22  defendant and reached towards him with the handcuffs. The
23  defendant grabbed the handcuffs and wrapped his hand around one
24  end of the handcuffs, preventing them from being successfully
25  deployed. Agent Griffin attempted to help Agent Crawford
26  secure the handcuffs on the defendant. He reached across the
27  defendant's chest area to assist Agent Crawford as they
28  attempted to handcuff the defendant. The defendant then leaned

forward and aggressively bit Agent Griffin's bicep area. In response, Agent Crawford deployed his collapsible steel baton and struck the defendant several times in the area of the upper thigh. Both Agents Griffin and Crawford were beginning to feel the effects of physical exhaustion.

By this time several other Agents were responding to the area. Border Patrol Agents John Scott and Adela Herrera-Martin arrived and were able to handcuff the defendant in the front of his body. The defendant continued to violently resist and Agents were able to remove him from the immediate area of the border fence. As Agents moved him away from the fence, he was asked several questions which he did not answer.

Agents summoned Emergency Medical Services (EMS) to treat both Agent Griffin and the defendant on the scene. The defendant had suffered a head blow when falling from the fence, his mouth and nose were bleeding, and he was contaminated with OC spray. The defendant's blood had transferred to Agent Griffin during the struggle. Just prior to the arrival of EMS, Agent Perez asked the defendant if he had "SIDA" (HIV). The defendant responded "Si" (yes) and Agent Perez asked him how he knew. The defendant replied, "Me examine hace tres meses y resulto positivo." (I tested three months ago and it came back positive.)

Prior to transport, Agent Perez questioned the four other subjects as to their citizenship. All of the subjects stated they were citizens and nationals of Mexico without immigration documents. The defendant and the four other aliens were transported to the Imperial Beach Station for processing at

approximately 3:25 a.m.

Routine record checks of the defendant revealed a criminal and immigration history. The defendant's record was determined by a comparison of his criminal record and the defendant's current fingerprint card. Official immigration records of the Department of Homeland Security revealed that the defendant had been previously arrested on 43 occasions by the Border Patrol and had previously been formally removed to Mexico on 8 prior occasions, most recently on May 13, 2004, through El Paso, Texas. These same records show that the defendant has not applied for permission from the Attorney General of the United States or his designated successor, the Secretary of the Department of Homeland Security, to return to the United States after being removed.

DEFENDANT STATEMENT

The defendant was advised of his Miranda Rights in the Spanish language and asked if he had understood those rights. Ortiz said that he understood his rights, and was willing to answer questions without the presence of an attorney.

Ortiz said that his true and correct name is Jose Silviano Ibarra-Murrieta, but stated that his name in immigration records is different because he had given a false name in a prior arrest.

Ortiz stated that he is an undocumented Mexican national and that he is illegally present in the United States. He stated that he does not have, nor has he ever had, any immigration documents allowing him to enter or be in the United

States legally. Ortiz said that he was born on November 3, 1966, in Guanajuato, Guanajuato, Mexico. He stated that he currently lives in Colonia Carranza, in Tijuana, Baja California, Mexico. Ortiz stated that he is known by the moniker "El Colas."

When asked how many times he had been arrested by the Border Patrol, Ortiz stated that he thought he had been arrested about 20 or 30 times.

Ortiz stated that he knew it was against the law for him to return to the United States after being deported. He further admitted that he has never applied for permission from the Attorney General of the United States or the Immigration service to re-enter the United States after being deported.

When asked how he had become involved in the smuggling of undocumented aliens, Ortiz said that he had begun smuggling aliens in 1996 as a foot guide, crossing groups of undocumented aliens on foot. He stated that he has always worked for himself, and that he has never been employed by anyone else. Ortiz stated that he believed that he has been successful crossing groups of undocumented aliens about 100 times.

As it relates to his arrest on March 15, 2008, Ortiz stated that he had made a mistake and decided to guide a group of aliens into the United States again. He said that he did so out of economic necessity since he has 7 children and needed the money. Ortiz said that he found the aliens at the border fence and offered to cross them into the United States. He stated that there were four undocumented aliens in the group he was crossing. Ortiz initially denied that he had made

1   financial arrangements with them and stated that he was in fact
2   going to cross himself. Ortiz then recanted and said that he
3   was going to be paid $300.00 (USD) for each alien he
4   successfully smuggled into the United States, and that he was
5   working for an individual named Juan.
6       Ortiz stated that he was taking the group to the San
7   Ysidro Swap Meet, where the jungle ends in the river bottom.
8   He stated that Juan had told him to take them there, where they
9   were going to be picked up. When asked who was coming for
10  them, Ortiz said that the smuggled aliens were going to call
11  for the ride. When pressed on this point Ortiz said that he
12  did not know who was coming to pick them up, and he had just
13  been told to take them there. Ortiz admitted that he knew that
14  the persons he was crossing did not have documents allowing
15  them to enter the United States legally.
16      Ortiz was asked about the $3,000.00 (USD) which was found
17  on his person at the time of his arrest, and stated that this
18  was money which he had saved up, and that he was going to use
19  it to pay a load driver to take him north to San Fernando.
20      When asked why he had struggled and fought with agents,
21  Ortiz stated that he had only tried to run away. When asked
22  why he had tried so hard to escape, he stated that he did not
23  want to go back to prison and that it was ugly in prison.
24      Ortiz stated that he had initially tried to run for "the
25  canal" but that an Agent had caught up to him and grabbed a
26  hold of him. He stated that he tried "to force his way" away
27  from the Agents, and that he some how managed to slip away from
28  them. When asked how he had gotten away, Ortiz said that he

1  had slipped out of the Agents' grasp. Ortiz stated that he
2  then ran towards the primary border fence, at a spot where
3  there is a gate where the tractor trailers pass through. He
4  stated that he tried to climb over the fence but the Agents
5  caught up to him again.
6      Ortiz stated that he grabbed a rock because he wanted the
7  agents to back off and let him go. Ortiz denied throwing a
8  rock at the agents and said that he dropped the rock in order
9  to climb over the fence. When asked, Ortiz stated that it had
10 been a small rock.
11     Ortiz said that as he was trying to climb over the fence
12 but the Agents caught him and were beating him. He stated that
13 he was letting himself be arrested. When asked if he had
14 punched or kicked at the Agents, he stated that he had not.
15 When asked if he had bit one of the Agents, Ortiz said that he
16 did, because the Agents were choking him. When asked if he had
17 grabbed one of the Agent's handcuffs, Ortiz said that he had,
18 and that it had left a mark on his hand. When asked why he had
19 grabbed the handcuffs, Ortiz said that he had done so out of
20 desperation. Ortiz added that they sprayed him with pepper
21 spray and that it was really hot.
22     When asked why he had told agents that he was suffering
23 from AIDS, Ortiz denied having said that. When asked if he had
24 claimed to have Tuberculosis, Ortiz stated that he had said
25 that, and that he does in fact have the beginning stages of
26 Tuberculosis.
27
28

MATERIAL WITNESSES STATEMENTS

Material witnesses Antonio Galvez-De Jesus, Adolfo Galvez-De Jesus, Albertano Pantaleon-Najera agreed in summary that they are citizens and nationals of Mexico illegally present in the United States. Material witness Francisco Ramirez-Velasquez stated he is a citizen and national of Guatemala illegally present in the United States. They all admit to entering the United States illegally. All material witnesses stated that they were going to pay between $1,000.00 to $2,800.00 to be smuggled into the United States. All the material witnesses were shown a photographic line up and were able to identify the defendant Martin Ortiz-Castaneda as the foot guide of the group.

CONCLUSION

I believe there is probable cause to believe that on or about March 15, 2008, within the Southern District of California, defendant Martin Ortiz-Castaneda did knowingly and intentionally, willfully and forcibly assault, resist, oppose, impede, or interfere with a person named in Title 18, United States Code, Section 1114, namely Department of Homeland Security, United States Border Patrol, Border Patrol Agent John M. Griffin, in that the defendant, in an effort to resist arrest, attempted to kick Griffin, fled from Griffin, threatened to strike Griffin with a large rock, and bit Griffin while Agent Griffin was engaged in the performance of his official duties, in violation of Title 18, United States Code, Section 111(a)(1).

1       I believe there is probable cause to believe that on or about March 15, 2008, within the Southern District of California, defendant Martin Ortiz-Castaneda, with the intent to violate the immigration laws of the United States, knowing and in reckless disregard of the fact that aliens, namely, Antonio Galvez-De Jesus, Adolfo Galvez-De Jesus, Albertano Pantaleon-Najera, Francisco Ramirez-Velasquez had not received prior official authorization to come to, enter and reside in the United States, did bring to the United States said aliens and upon arrival did not bring and present said aliens immediately to an appropriate immigration officer at a designated port of entry; in violation of Title 8, United States Code, Section 1324(a)(2)(B)(iii).

      I also believe there is probable cause to believe that on or about March 15, 2008, within the Southern District of California, defendant Martin Ortiz-Castaneda, an alien, who previously had been excluded, deported and removed from the United States to Mexico, was found in the United States, without the Attorney General or his designated successor, the Secretary of the Department of Homeland Security (Title 6, United States Code, Sections 202(3) and (4), and 557), having expressly consented to the defendant's reapplication for admission into the United States; in violation of Title 8, United States Code, Section 1326.

      Finally, the affiant states that Antonio Galvez-De Jesus, Adolfo Galvez-De Jesus, Albertano Pantaleon-Najera, and Francisco Ramirez-Velasquez are citizens of a country other than the United States; that said aliens have admitted that

they are deportable; that their testimony is material; that it is impracticable to secure their attendance at the trial by subpoena; and they are material witnesses in relation to this criminal charge and should be held or admitted to bail pursuant to Title 18, United States Code, Section 3144.

Executed on March 16, 2008 at 4:00 p.m.

_____   3/17/08
VICTOR L. NGUYEN, Special Agent
Federal Bureau of Investigation

On the basis of the facts presented in the probable cause statement consisting of 12 pages, I find probable cause to believe that the defendant named in this probable cause statement committed the offense on March 15, 2008, in violation of Title 18, United States Code, Section 111(a)(1) and Title 8, United States Code, Sections 1324 and 1326.

_____   3/16/08  6:15 pm
Honorable LUISA S. PORTER              Date/Time
United States Magistrate Judge

                                       3/17/08 - 1:45 pm

LEO S. PAPAS
U.S. MAGISTRATE J[UDGE]